**Michael Ned MATHIAS f/k/a Nenad Matijasevic, Plaintiff,**

v.

**Bradley S. JACOBS Defendant.**

No. 99 Civ.2004.

United States District Court,
S.D. New York.

Oct. 31, 2002.

Patrick M. Reilly, Delbello Donnellan Weingarten & Tartaglia, LLP, White Plains, NY, for Plaintiff.

Leslie A. Lupert, Orans, Elsen & Lupert, New York City, for Defendant.

### DECISION AND ORDER

MARRERO, District Judge.

## I. BACKGROUND

By its decision rendered on September 27, 2001 (the "2001 Decision")[1] ruling on a motion for summary judgment, the Court determined that plaintiff Michael Mathias ("Mathias") was entitled to recover damages from defendant Bradley Jacobs ("Jacobs") for breach of a 1992 stock option agreement (the "Option Agreement" or "1992 Option Agreement") that contained a so-called "non-contact" promise the Court held unenforceable. The Court then directed the parties to propose a basis for computing any damages that Mathias may be entitled to recover by reason of the breach. In response, the parties submitted significantly different theories and

---

1. The 2001 Decision is reported as *Mathias v. Jacobs,* 167 F.Supp.2d 606 (S.D.N.Y.2001) (*"Mathias I"*). The events and factual issues surrounding the parties' conflict are summarized below insofar as pertinent to the determination of damages now before the Court.

methods to calculate the extent to which Mathias had suffered injury, including disagreement over the valuation of Mathias's stock options as of the time he purportedly exercised whatever rights he then held.

In a decision dated January 7, 2002 (the "2002 Decision")[2] the Court identified three disputed issues of fact that required a trial on damages:[3]

1. Whether certain interests in the form of stock options and shares that Jacobs granted to Mathias in 1995 and 1997 constitute partial payment or credits towards any liability Jacobs may have had under the Option Agreement, thus reducing Jacobs's obligation to Mathias by the value of those securities;

2. Whether the value of Mathias's 1992 options on March 15, 1999, the date he sought to exercise them, was the publicly listed closing price of the underlying stock on that day, or the market price adjusted by the effects of certain undisclosed accounting fraud that allegedly inflated the price of the stock;

3. Whether the Court's invalidation of the non-contact provision contained in the parties' 1992 agreements requires, for the purposes of calculating damages, apportioning the value of the consideration the parties exchanged in connection with the Option Agreement and reducing any damages to which Mathias may be entitled by the portion of the consideration attributable to the unenforceable promise.

The Court held a bench trial on these issues on July 29—August 1, 2002.

## II. FACTS

Mathias and Jacobs entered into the Option Agreement on June 1, 1992 in order to resolve a conflict that had arisen following the termination of Mathias's employment as a consultant to United Waste Systems, Inc. ("UWS"), a company of which Jacobs was the principal owner and chief executive. One aspect of that dispute involved Mathias's claim that Jacobs had promised him ownership of a five percent interest in UWS shares, a commitment Jacobs denied having made.

According to the Option Agreement, in order to settle their dispute, Jacobs granted Mathias an option to purchase 400,000 shares of UWS stock at $3.00 per share exercisable between June 1, 1994 and May 31, 1999. Mathias agreed to release and discharge all existing and potential claims or debts of any kind he might have against Jacobs, whether past, current or future. The Option Agreement contains a non-contact provision that states:

By way of illustration, the Option shall be automatically and unconditionally rescinded and terminated should [Mathias] contact, telephone or send a letter to any officer of the Company other than its Chief Executive Officer, or should [Mathias] contact, telephone or send a letter to any family member of any officer including the Chief Executive Officer.

(Option Agreement ¶ 2(c).)

At the same time, the parties executed another contract, (the "United Waste Agreement") that contained a severance package for Mathias. In it, UWS undertook to pay Mathias his regular monthly compensation of $8,000 plus health benefits for a period of 24 months commencing in June of 1992. The United Waste Agree-

2. The 2002 Decision is reported as *Mathias v. Jacobs*, 179 F.Supp.2d 328 (S.D.N.Y.2002).

3. *See id.* at 329.

ment contained covenants by which Mathias committed for a period of two years to maintain the confidentiality of UWS trade secrets and not to compete with the company. It also included the full version of the non-contact provision referred to in the Option Agreement that this Court ruled excessively broad and thus unenforceable.[4]

At some point after execution of the 1992 agreements, Mathias left for Europe and returned in late 1994 or early 1995. At a meeting between the parties shortly thereafter, Mathias informed Jacobs that he wanted to exercise his UWS options. What transpired at this meeting forms the focal point of much of the parties' dispute and frames the issues now before the Court. The parties' accounts of their conversation and resulting understanding clash in material ways.

At trial, Mathias maintained that he told Jacobs that he wanted to exercise his right to UWS shares under the Option Agreement and that Jacobs responded that the timing was not convenient, that Mathias should postpone his request to a time when Jacobs was in a better position to deliver the UWS stock, and that he could earn money by providing consulting services for UWS. Under Mathias's version, Jacobs agreed to retain Mathias as a consultant to UWS and later authorized new UWS options issued to him in 1995 and 1997 as compensation for actual work Mathias performed for the company in those years. Mathias also testified that at the time the new options were granted to him in 1995 and 1997 there were no discussions or understandings of any kind between the parties that those benefits constituted partial payments or credits of any kind towards reducing Jacobs's obligation to deliver the UWS stock pursuant to the Option Agreement.

According to Jacobs's rendering of the same encounter, Jacobs informed Mathias that the Option Agreement had automatically expired by its own terms by reason of impermissible contacts Mathias had made with UWS people soon after the 1992 agreements went into effect. Jacobs claimed that during this conversation Mathias acknowledged that the Option Agreement was a "dead deal." (Transcript of the Trial ("Tr."), at 353.) Jacobs contends that in recognition of Mathias's acceptance that the Option Agreement no longer existed, as a gesture of good will, and to keep relations with Mathias on favorable terms so as to avoid harm to UWS, he nonetheless agreed to permit Mathias to provide additional services to UWS and to compensate him in the form of new securities and other benefits.

In any event, on Jacobs's authorization, in December 1995 UWS granted Mathias a 10–year option to purchase 99,500 shares of UWS stock at $39.25 per share (the "1995 Option"). Mathias contends that this interest represented compensation for services he actually performed to UWS in 1995. The grant was approved by the UWS Board of Directors on October 11, 1995. Mathias points out that a footnote inscription in UWS's registration statement filed with the Securities and Exchange Commission indicated that these options were issued for "acquisition-related services." (Plaintiff's Trial Exhibit ("Pl.'s Ex.") 10, at 5.). Mathias exercised these options in January and February of 1996, receiving net proceeds of $639,412.90.

In March of 1997, UWS issued to Mathias an additional 10–year option to purchase 80,000 shares of UWS at $18.00 per share (the "1997 Option"). Mathias testified that this interest was intended as compensation for services he rendered to

---

4. *See Mathias I,* 167 F.Supp.2d at 612.

the company in 1997. Mathias exercised these options in May and June 1997, receiving net proceeds of $1,775,008.55.

In August of 1997 Jacobs completed a sale of UWS to USA Waste, which later became Waste Management, Inc. ("WMI"), and then formed a new business, United Rentals, Inc. ("URI"). In September, 1997 Mathias was granted a Subscription Agreement to purchase 100,000 shares of URI (the "URI Stock"). The URI Stock was made available to him, before the company's initial public offering ("IPO"), at a "Friends and Family" price of $3.50 per share. The stock was subject to some restrictions on sale. Not more than one-third could be sold at any given time after one, two and three years of the purchase. Mathias purchased 100,000 shares of URI in his wife's name. URI went public in December of 1997 at a price of $13.50 per share.

In December of 1998 Mathias sold one-third of the shares, netting a total of $963,283.00, after deducting the purchase price. Mathias testified that, like the 1995 and 1997 Options, Jacobs granted him this benefit in payment for services Mathias had rendered to URI in the summer and fall of 1997. In December of 1999 URI prevented Mathias from selling the next third of the URI Stock and commenced litigation in Florida state court against Mathias and his wife (the "Florida Action") to recover the URI Stock, including the proceeds of the first shares Mathias sold.

Mathias purported to exercise his right under the Option Agreement on March 8, 1999 by written notice to Jacobs requesting delivery of the WMI securities by March 15, 1999 and tendering the purchase price of $1,200,000.00. The 400,000 UWS options Mathias claims he still held under the Option Agreement, after splits, adjustments and UWS's merger with WMI, converted to 191,111.09 shares of

WMI as of March 15, 1999. On that date the closing price for WMI shares on the New York Stock Exchange ("NYSE") was $48.00.

## III. THE ARGUMENTS AND LEGAL THEORIES

The parties offer divergent theories of damages corresponding to their respective versions of what occurred at their meeting in early 1995 when Mathias first communicated his intent to exercise his option under the Option Agreement. Mathias, according to his account of the discussion, came away with the understanding that the Option Agreement remained in effect and that his right to enforce it was simply postponed at Jacobs's request to a time more convenient to Jacobs. Moreover, in Mathias's view there was no mention then, nor at any of his subsequent conversations with Jacobs, that any of the later compensation or benefits Mathias received from UWS or Jacobs would be applied against the value of his 1992 options so as to reduce Jacobs's liability. In consequence, Mathias contends that Jacobs remained obligated to make good on his commitment to deliver the UWS shares that the Option Agreement provided for and that any subsequent rewards Mathias obtained from Jacobs had nothing to do with the earlier contract, but rather represented payments, over and above what Jacobs owed under the Option Agreement, for work Mathias actually performed in 1995 and 1997.

Under Jacobs's theory, in reliance upon Mathias's acknowledgment that he no longer had any rights and Jacobs had no remaining obligations under the 1992 Option Agreement, Jacobs entered into a new relationship with Mathias. He undertook to find projects for Mathias to work on and to compensate him in accordance with the new arrangement as long as Mathias re-

mained on good terms with the company. Thus, Jacobs conceived of his agreeing to renew Mathias's association with UWS in the context of an understanding that the Option Agreement was a dead letter. To this extent, Jacobs argues, the 1995 and 1997 Options and the URI Stock interests Mathias later obtained from him were entirely unrelated to any obligation arising under the revoked Option Agreement.

Alternatively, Jacobs maintains that even if he had not effectively cancelled and supplanted the Option Agreement, he granted to Mathias financial interests that were understood to have been made in satisfaction of all or portions of Jacobs's commitment under the Option Agreement, and that to allow Mathias to compel delivery of the 1992 options while already having received a substituted performance would comprise unjust enrichment. Moreover, Jacobs contends that Mathias's non-contact promise constituted the predominant benefit for which Jacobs had bargained and agreed to grant the 1992 options, and that because that provision was held unenforceable, the consideration Jacobs agreed to pay Mathias for the Option Agreement should be apportioned and reduced by the proportionate value of the total obligation attributable to the invalidated clause.

The task of resolving these sharply contrasting accounts of the parties' understanding and attendant theories of damages is complicated by the absence or any writing memorializing any accord purportedly reached at the parties' critical 1995 meeting. On this point, Mathias points to the Option Agreement itself, which provides that

> [t]here are no oral representations, understandings or agreements covering the same subject matter as this Agreement. This written Agreement is the final, complete and exclusive statement

and expression of the agreement between [Jacobs] and [Mathias] and of all the terms of this Agreement, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement may not be amended or terminated orally.

(Pl.'s Ex. 1; Option Agreement ¶ 11.)

Mathias construes this provision as precluding Jacobs from arguing and introducing parol evidence to prove that Mathias agreed orally to terminate his right to Jacobs's performance of the Option Agreement. Jacobs counters that by its own terms the Option Agreement was "automatically and unconditionally rescinded" in 1992 when Mathias violated the non-contact provision, and that consequently Jacobs was under no obligation to provide any written notice to Mathias, nor was Mathias's further agreement, oral or written, then required to effect a termination of the Option Agreement.

Jacobs's theory presents a conceptual hurdle difficult to overcome. The Court ruled the non-contact promise unenforceable, whether expressed in the United Waste Agreement, or separately in the Option Agreement. Accordingly, whether or not Mathias had violated this provision at the time of the parties' 1995 meeting, the clause had no legal effect. Jacobs's position necessarily requires giving a measure of recognition and enforcement to a provision that the Court later nullified. Jacobs could not represent that the Option Agreement had been cancelled and that he therefore no longer had any obligation to perform under it on account of Mathias's breach because the provision, void from the start, never acquired the effect of law. *See Wamsley v. Champlin Refining and Chemicals, Inc.,* 11 F.3d 534, 539 (5th Cir. 1993) ("Void promises are not legally binding.... To say that a promise is void is

to say that it created no legal obligation...."); Restatement (Second) of Contracts § 7 cmt. a (1981) (noting that "a promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor ... is [a] 'promise' or 'agreement' that is void of legal effect."). For the same reason, even if oral and not otherwise documented, Mathias's purported agreement that the Option Agreement was rescinded could not be binding because his alleged violation would have related to an invalid promise.

Mathias's theory that the existence of the Option Agreement was unaffected by the parties' 1995 discussion better comports with the legal posture of the case. An oral agreement to amend or terminate the Option Agreement would have contradicted its express language. But even if he had entered into such an understanding, by operation of law that accord could not be recognized by the Court because it would be tantamount to enabling Jacobs to enforce a void promise. *See Long v. Sears Roebuck*, 105 F.3d 1529, 1536 n. 10 (3d Cir.1997) (noting that void promises cannot be enforced or ratified because they are not legally binding). Against this standard, the Court thus proceeds to consider whether Mathias has presented sufficient evidence to sustain his theory of damages.

## IV. *FINDINGS OF FACT*

### A. *ASSESSMENT OF CREDIBILITY*

Because so much of Mathias's position rests on what was said at his 1995 meeting with Jacobs and is not supported by any other documentary record, in considering the validity of the claim the Court must rely substantially on its assessment of the credibility of Mathias's account of the events and the parties' discussions, in contrast to Jacobs's version. This comparison must be weighed against the overall veracity of the balance of the trial testimony, the parties' subsequent dealings, any credible corroboration by the evidence of other witnesses and by documentary proof, as well as by the logic of the situation assayed in the context of ordinary experience and common sense. Under these measures, Mathias fails to persuade the Court that he has met his burden of proof concerning the damages he claims.

As a threshold matter, and affecting the Court's judgment regarding every aspect of Mathias's assertion of damages, the Court notes that it found in Mathias's testimony significant gaps, contradictions and equivocation, detailed below with more particularity, that rendered his demeanor and presentation less than forthcoming. This apparent lack of candor on the claimant's part yielded consequential lacunae of illogic in the evidence and conceptual grounding proffered to support his claim. In contrast, the Court perceived in the demeanor and general impression created by Jacobs and witnesses John Milne, Oscar Folger and Ronald Quintero—and in the consistency of these individuals' accounts as to critical details—to reflect the more credible and compelling version of disputed events. Their testimony is more persuasively supported by other evidence on the record, and better comports with the empirical guidance served by logic and common sense. On these grounds, in the instances where material conflicts or doubts appear in the parties' respective accounts of disputed facts, the Court has resolved the issues against Mathias. With this perceptual assessment as a backdrop, the Court proceeds to examine the evidence relating to the core disputes upon which the bulk of Mathias's claim for damages is founded.

### B. *THE CREDITS*

In Mathias's direct testimony at trial, he insisted categorically that the val-

ue he received in the form of the 1995 and 1997 Options and the URI Stock had no connection whatever to Jacobs's obligations to deliver the UWS shares as specified under the Option Agreement. By his account, in each of the three instances during which he was informed by Jacobs that Jacobs had decided to grant him the interests in the 1995 and 1997 Options and the URI Stock, the contact was initiated unexpectedly by Jacobs, who, in conferring these considerable benefits, simply expressed appreciation for Mathias's patience and forbearance and services to UWS. (Tr. at 51–54, 64–65, 186.) According to Mathias, on none of these occasions did the subject of the Option Agreement arise. He specifically stated that "absolutely" no discussion occurred during which any mention was made to suggest that Jacobs regarded any of these securities as credits or offsets reducing Jacobs's obligation under the Option Agreement. (*Id.* at 65.)

Mathias also stated, however, that during those very discussions with Jacobs, as he had on other occasions, he told Jacobs that he desperately needed *"the money, I wanted to exercise my options,"* but that Jacobs replied that because the time was not convenient "he will reward me with the [1995 and 1997] options." (Tr. at 48.) In proper context, Mathias's repeated references, during conversations with Jacobs prior to and contemporaneous with Jacobs's granting him the 1995 and 1997 Options, to "my money" and "my cash" could have no sensible reference point or meaning other than the funds Jacobs presumably owed him under the 1992 Option Agreement. When pressed by the Court on this point, Mathias did acknowledge, inconsistent with his direct testimony, that in fact conversations with Jacobs on the subject had occurred at the time he was granted the 1995 and 1997 Options, and that during those discussions there was

mention of his 1992 option rights. (Tr. at 73, 76.)

In fact, Mathias actually went as far as asserting to the Court that he himself regarded the compensation he sought or expected from Jacobs in 1995 and 1997 as an either/or proposition in relation to his 1992 option rights or recompense for current services. In response to the Court's question concerning whether his mention of the need for "my money" during his discussions with Jacobs specifically referred to the 1992 options, Mathias answered: "No. I was requesting *either* to exercise—to be let *to exercise my options or to be rewarded for the work that I was doing* and performing for the company—*to be paid.*" (Tr. at 75 (emphasis added).) In this passage, Mathias not only belied his earlier testimony to the effect that the subject never arose in his discussions with Jacobs, but effectively conceded that he regarded his remuneration by UWS for his 1995 and 1997 services as just an alternative method of obtaining payment for his 1992 options.

This admission is consistent with Mathias's testimony in his Florida Action deposition. Asked to express his understanding of the reasons for his having received the UWS options and shares in 1995 and 1997, Mathias responded that he was "accepting the rights of that stock as a reimbursement to me rather than a gain on the stock. I was happy just to get *my money* back *in any possible way* . . . ." (Florida Action Deposition ("Fl.Dep.") at 497 (emphasis added).)

Even more dramatically conflicting and undermining of his claim, Mathias left unexplained the unequivocal admissions he made under oath in depositions taken in connection with the Florida Action that he understood each of the three transactions granting him the options and stock bene-

fits in 1995 and 1997 to have been intended and accepted as "partial payment" reimbursing him for what Jacobs owed him under the 1992 Option Agreement, and thus reducing Jacobs's obligation towards Mathias. (Tr. at 192.)[5] Mathias's stark, inexplicable self-contradiction on this crucial point leads the Court to conclude that Mathias's account of his claim at the trial of this matter is neither credible nor logical.

Mathias seeks to explain away his testimony concerning the connection between Jacobs's granting him the 1995 and 1997 Options and the URI Stock benefit and the reduction of Jacobs's obligation under the Option Agreement. To this end, he asserted that these statements did not derive from anything said in actual conversations he had with Jacobs, but from "something that was subjective in my own mind." (Tr. at 187–88.) But this rationale is not only unpersuasive in substance, it also flies in the face of Mathias's responses to the Court's questions, and collides head on with his prior testimony, also under oath.

Mathias's statements in the Florida Action deposition could not convey more explicitly that he attributed his understanding that the compensation he received from Jacobs in 1995 and 1997 reduced the 1992 obligation, not to any subjective belief he harbored in his mind, but to discussions with Jacobs about this very point. (Tr. at 192; Fl. Dep. at 462, 523–25 ("Q. But did you have a conversation with Mr. Jacobs about getting these options before you got them?" "A. Yes.").)

Material inconsistencies in Mathias's testimony are also manifest in his explanation of the purpose for which he received the 1995 and 1997 Options and the URI Stock benefit. At trial, Mathias testified that these interests were intended solely to compensate him for consulting services he actually rendered to UWS and URI. (Tr. at 44–45, 48–49, 62–63, 79–80.) In his depositions in this case and in the Florida Action, however, Mathias flatly and consistently denied that these interests had any-

---

5. In his deposition in the Florida Action, Mathias repeatedly admitted that he had numerous discussions with Jacobs about the exercise of his 1992 options during which Jacobs assured him that Jacobs would "make it up" to him. (Fl. Dep. at 455.) He testified that:

> [o]ur *conversation* about him reimbursing me was based on an existing written contract, moral contract and verbal contract that we had. There was no other reason why he would be paying me all of this money and giving me all of the stock and options that I ended up with.

(*Id.* at 462 (emphasis added).) According to the same testimony, upon learning from Jacobs that he had been granted the 1995 Options, Mathias was elated that Jacobs had kept his word and was "working very hard to basically reimburse me and pay me back what he owed me under the 1992 agreement." (*Id.* at 474.)

In connection with the 1997 Options, Mathias stated that Jacobs "said" to him "[h]ere is another tranche in consideration to what I owe you. . . . [I]t was just showing me anoth-

er sign that he's going to live with our agreement and repay me in full. . . ." (*Id.* at 523–24.) With respect to the URI Stock, Mathias testified in the Florida Action that he had several discussions with Jacobs in the space of a month concerning the money Mathias claimed Jacobs still owed him in connection with the 1992 options and that Jacobs promised that Mathias would receive some shares in the new company, the effect of which would be to "reduce his obligation towards me if I got the shares before IPO at three dollars, as I did." (*Id.* at 79.) Mathias elaborated that he regarded the URI Stock as "a great investment and a quick way to recover the debts and the money that Mr. Jacobs owed me." (*Id.* at 85.)

All in all, asked in his deposition for this action whether by means of the 1995 and 1997 Options he believed he had been paid $2,400,000 towards whatever amount was due him under the 1992 Option Agreement, Mathias testified: "Yes." (Deposition of Michael Ned Mathias at 71.)

thing to do with any work he performed on UWS's or URI's behalf.[6]

Another substantial disparity in Mathias's testimony occurs in his description of the nature and extent of the alleged services he performed for UWS and URI in 1995 and 1997. In response to questions from the Court, Mathias stated that regarding his work for UWS from the spring to the end of 1995, he considered the amount of his services, while something less than regularly 40 hours per week, to be "full-time on my side because I had nothing else to do." (Tr. at 72.) With regard to his alleged services for URI in 1997, Mathias testified to a question by the Court that he spent two or three hours per day over a period of three months. (Tr. at 77–78.) But during cross examination, Mathias conceded that in his earlier deposition he had stated that the amount of time he spent on his work for UWS in 1995 was "a couple of hours maximum a month." (Tr. at 88.)

On this point, the testimony of John Milne ("Milne"), the UWS executive to whom Mathias reported, refuted Mathias's trial account of the nature and extent of his work. Milne stated that whatever services Mathias rendered during the period in question were minimal because Mathias was not involved in the entire scope of any transaction, but at most attended a few meetings, made some phone calls and had nominal business development contacts. (Tr. at 241–44.) While Mathias asserts that any credit the Court finds reflected in Mathias's acceptance of the 1995 and 1997 payments should be reduced by the value of the services he actually rendered, Mathias not only failed to offer any evidence supporting a reasonable allocation of value to these services, but also confounded his own claim by further testifying that he did not expect payment from these transactions unless they closed. (Tr. at 83–84.)

Mathias's theory fails not only by his own inherent contradictions but by its flawed logic that offends common sense. As a threshold matter, the Court notes that, according to unrefuted evidence on the record, at the time Mathias first expressed to Jacobs in late 1994 or early 1995 his desire to exercise his options under the 1992 Option Agreement, Mathias's interest had a net value of approximately $1,000,000. (Tr. at 114–19.) Some months thereafter, in December of 1995, Mathias received the 99,500 UWS options,[7] which he subsequently sold in January and February of 1996 for $639,412.90. (Tr. at 48–

---

**6.** In this connection, Mathias testified that

"Q: Were these options in any part payment for the work you had been doing on United Waste's behalf?

"A: No.

. . . .

"Q: Were you otherwise paid for the work you had done on United Waste's behalf?

"A: No.

"Q: Did you expect to be paid for it?

"A: I was expecting to be paid if the deal comes through. Unfortunately, none of those deals came through."

(Tr. at 83–84 (quoting Mathias's Fl. Dep. at 474–75).)

Similarly, Mathias testified at trial that the URI Stock subscription he had received rep-

resented compensation for work on a particular URI deal. But in his deposition taken in connection with the instant case, Mathias stated that the URI stock had no connection with that transaction. (Tr. at 85.)

**7.** At the time Mathias obtained the 1992 option rights, UWS was still privately owned, so its shares had no recognized public market value. Moreover, the 1992 options were unregistered and had a five-year expiration. By contrast, the 1995 and 1997 Options pertained to a company then publicly traded, were registered and had a life of ten years, all factors that added greater liquidity and intrinsic and time value to the latter securities. (Tr. at 353–54, 530–32.)

50.) In March of 1997, the value of the 1992 options, insofar as Mathias still had any right to exercise them and reflecting any credit due Jacobs on account of the sale of the 1995 Options the year before, would still have netted him approximately $1,627,219.[8] Mathias then received another tranche of UWS options which he sold in May and June of 1997, realizing net proceeds of $1,775,008.35. (Tr. at 55.) Months later in 1997 Mathias was granted the opportunity to purchase the URI Stock at its pre-IPO price. From the sale of the first third of these securities he derived net profits of $963,283. (Tr. at 80.) The remaining two-thirds of these stocks have value that, according to Jacobs's post-trial submission, would yield Mathias net profits of $593,36.30 were they sold at current prices.

Thus, under Mathias's reckoning, starting with an interest in securities worth to him approximately $1,000,000 early in 1995, had Jacobs honored the 1992 Option Agreement at that time, Mathias to date has actually realized profits totaling $3,377,704.20, not counting interest on the value of the proceeds, nor the benefit of his remaining URI Stock.

None of the theories Mathias advances to explain this apparent incongruity holds sway under rational scrutiny. Mathias maintains in this action that by conveying the 1995 and 1997 interests, Jacobs was merely rewarding him for his patience and forbearance in not exercising the 1992 options until Jacobs was in a position to pay him. But this hypothesis assumes that, for reasons left unexplained, Jacobs, in exchange for Mathias's patience in not pressing a $1,000,000 obligation, would bestow open-ended rewards that already far exceed the original debt and do nothing to extinguish the underlying liability, which continues to mount unabated. This theory not only lacks coherence and sense on its own terms, but is contradicted by Mathias's countervailing explanation, consistently advanced in his Florida Action deposition, that in fact the benefits Jacobs had vested upon him by means of the 1995 and 1997 securities represented part payments meant to reduce the 1992 obligation. However, this hypothesis does not address why there would be no upper limit on Jacobs's original debt of approximately $1,000,000 for which Mathias has so far netted more than its value in "partial payments" and which he has continued to press long after those reimbursements should have fully satisfied the debt.

Mathias's theory posits a third rationale that is no more consistent or convincing: his proposition that the 1995 and 1997 securities Jacobs granted him represented payment for real services Mathias rendered to UWS. First, Mathias's testimony on this point is self-contradictory. He asserted in his Florida Action deposition that there was no connection between the 1992 securities and the services he allegedly rendered to UWS in 1995 and 1997, for which he said he would be compensated only if the particular transactions closed. (Tr. at 83–84.) Moreover, Mathias testified at trial, inconsistently, that his work for UWS in 1995 and 1997 entailed no more than a few hours per month. There

---

**8.** In mid-March of 1997 the price of UWS shares was approximately $39. (Pl.'s Ex. 8.) As of that date, by virtue of a four and one half to one reverse split in UWS shares, Mathias's exercise right converted to 88,888 options at an exercise price of $13.50. (Tr. at 353.) Thus, had he exercised the 1992 options then, Mathias would have acquired UWS stock worth $3,466,632, for which he would have paid $1,200,000, a net gain of $2,266,632. Subtracting the profit from Mathias's sale of the 1995 Options presumably would leave a balance of $1,627,219, not adjusting for the value of one year's interest on the 1995 proceeds.

is no evidence that any of the transactions in which Mathias alleged involvement was ever consummated. It would defy common sense understanding of ordinary business practice for corporate executives to lavish disproportionate largesse totaling in excess of $3.4 million for supposed "consulting services" of such nominal scope, duration and actual results, especially when, according to Milne, the maximum amount UWS had paid to a consultant actually engaged from beginning to end in an entire acquisition deal was approximately $200,000. (*Id.* at 261–62.)

Mathias's claim rests upon another dubious proposition founded on an equally faulty premise. All of his various conflicting theories presuppose that Jacobs, a sophisticated executive who has otherwise demonstrated considerable business acumen in developing several highly successful commercial ventures, would knowingly—on four separate occasions between 1995 and 1997—enter into essentially open-ended transactions with Mathias, with whom he had earlier parted company under highly strained and fearful circumstances, that were so extravagantly bountiful and one-sided.

Mathias labors under a heavy burden of persuasion. In essence, he maintains that in exchange for no additional consideration other than Mathias's "patience" in not pressing a $1 million debt, Jacobs bestowed upon him interests in securities of his companies with a cash value exceeding $3.4 million and yet today still remains personally liable to Mathias for the full amount of the original debt—$7,973,328, according to Mathias's market valuation of the 1992 securities.

Any ordinary person of reasonable prudence and intelligence would find such a notion implausible if not irrational. Simply stated, the theory makes no economic sense, especially given unrefuted evidence that at the time the UWS board members approved the issuance of the 1995 Options to Mathias, Jacobs informed them that the transaction was grounded on a supplanting of the 1992 Option Agreement, (Tr. at 436–38), and that one member of the board acknowledged having been told by Mathias that the 1992 deal had been "lost," (Deposition of J. Bryan Williams, III, at 9, 10, 13). Given its apparent absence of a rational grounding, Mathias's hypothesis calls for more compelling proof, and Mathias failed to muster it. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[I]f the factual context renders [a party's] claim implausible—if the claim is one that simply makes no economic sense—[that party] must come forward with more persuasive evidence to support the[ ] claim than would otherwise be necessary."); *see also Gidatex v. Campaniello Imports, Ltd.*, 49 F.Supp.2d 298, 304–305 (S.D.N.Y.1999).

It is not surprising, therefore, that when Mathias surfaced again in March of 1999—two years after Jacobs had granted him the URI Stock subscription benefit, and weeks before the 1992 options were due to expire—once more expressing a desire to exercise those options, Jacobs's reaction, according to Mathias's own testimony, conveyed words to the effect of: "[y]ou've got to be kidding." (Tr. at 104.)[9] Reminded by Jacobs of all of the payments Mathias had already received on account of an obligation which Jacobs considered either

---

**9.** Recounting his reaction at this encounter, Jacobs testified: "I was upset. I was very let down. I felt very betrayed. I felt that I had been played for a fool for a number of years. I felt I had trusted someone and that person wasn't deserving of the trust.... I was very disappointed." (Tr. at 369.)

dead or already satisfied, Mathias, in his deposition for this action, responded "that's absolutely correct and appreciated. However, there is still a balance to be exercised...." (Tr. at 105.)

In ordinary language, the meaning of the term "balance" suggests a relation of a part to a larger whole. In the particular context of the parties' dispute in this case, the word could reasonably be read to indicate an acknowledgment that the earlier payments Mathias had received from Jacobs in 1995 and 1997 in the form of interests in UWS and URI securities reduced the total amount Jacobs owed, leaving a "balance" still due. Mathias, however, seeks to explain his meaning to be not an amount still outstanding from a larger amount associated with the 1992 options, but a "balance of obligations" the parties owed each other, which to Mathias meant the entire value of the 1992 options. (Tr. at 105–107.)

The Court finds this gloss unpersuasive and disingenuous, especially when viewed against a backdrop of Mathias's repeated prior inconsistent statements, following conversations with Jacobs, unequivocally declaring that he understood and accepted those interests to represent partial payments reducing Jacobs's liability. In fact, the Court notes that one of the reasons probably underlying Mathias's claim in March of 1999 that there was still a "balance" owed him under the 1992 options is that from August 1997, when Jacobs sold UWS to WMI and granted Mathias the URI Stock interest, to March of 1999, the market price of WMI shares—and with it the presumed market value of Mathias's 1992 options, if still valid—had risen to $48.00 per share, and Mathias's UWS options were convertible into 191,111.09 shares of WMI.

At the UWS stock price of approximately $40 per share prevailing in June of 1997,

when Mathias sold the 1997 Options, the inherent value of Mathias's 1992 options would have been offset or exceeded by the gain he had already realized from the sale of the 1995 and 1997 Options, which two months later was augmented by the value of the URI stock subscription, leaving no "balance" due if in fact those interests were treated as payments towards Jacobs's 1992 obligation. Two years later, however, the significant surge in the market price of the WMI stock, attributable in part to exceptional circumstances described below, once again produced a large appreciation in apparent market value of the 1992 options that provided Mathias's opportunity to reassert his claim.

Based on all the circumstances discussed above, Mathias has not persuaded the Court that the 1995 and 1997 Options and the URI Stock subscription did not reduce or fully satisfy Jacobs's obligation under the 1992 Option Agreement. Accordingly, the Court concludes that Mathias's acceptance of these interests must be treated as constituting payments by Jacobs to Mathias towards satisfaction of Jacobs's liability under the 1992 Option Agreement.

Against the record of Mathias's acceptance of the 1995 and 1997 securities and conflicting accounts concerning their purpose and effect, any other result would be inequitable. To allow Mathias to retain the proceeds he realized from these interests and still collect the full amount of the original obligation would do violence to time-honored principles of equity established to prevent unjust enrichment and other injustices manifest here.

## C. *UNJUST ENRICHMENT*

█ Under the New York doctrine of unjust enrichment courts may infer the existence of an implied contrast " 'to permit one person who has obtained a benefit from another ... from unjustly enriching

himself at the other party's expense.'" *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2d Cir.1997) (quoting *Chadirjian v. Kanian*, 123 A.D.2d 596, 506 N.Y.S.2d 880, 882 (2d Dep't 1986)). The rule is grounded on equitable principles embodied under the concept of quasi-contracts, defined by the New York Court of Appeals as

> not really a contract at all, but rather a legal obligation imposed by law in order to prevent a party's unjust enrichment.... 'The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy.... [A] quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved.* The law creates it, regardless of the intention of the parties, to assure a just and equitable result.'

*Clark–Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (1987) (quoting *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643, 645 (N.Y.1970)) (emphasis in original; internal citations omitted); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.20 (2d Ed.1998); 1 Arthur Linton Corbin and Joseph M. Perillo, *Corbin on Contracts* § 1.20, at 63–64 (rev'd ed.1993). This rule applies to situations where, absent a valid agreement governing legal relationships in a particular transaction, the party sought to be charged has possession of money or other property that "in good conscience and justice he should not retain, but should deliver to another." *Matarese v. Moore–McCormack Lines*, 158 F.2d 631, 634 (2d Cir.1946).

In the context of a claim for offsets or credits, the Second Circuit, applying New York law, has articulated pertinent guidance: "To offset on a theory of unjust enrichment, there must first be enrich-

ment.... Equally crucial, as between the two parties to the transaction the enrichment must be unjust." *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982) (citing *Milman v. Denniston*, 271 A.D. 988, 68 N.Y.S.2d 325 (2d Dep't), *appeal dismissed*, 297 N.Y. 470, 74 N.E.2d 178 (1947) and *McGrath v. Hilding*, 41 N.Y.2d 625, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977)); *see also Maryland Casualty Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000) ("The controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another—the law abhors unjust enrichment.")

■ Here, these elements are satisfied. Clearly, Mathias has been enriched by the securities he has already received from Jacobs. As the Court determines below, under any of several relevant assumptions, the actual value of these interests substantially exceeds the maximum amount of damages Mathias may be entitled to recover from Jacobs by reason of the breach of the Option Agreement.

■ Under the circumstances of this case, Mathias's further enrichment would also be unjust. "To invoke equity requires the indispensable ingredient that between the two parties involved there must be an injustice." *Indyk*, 694 F.2d at 58. The Court has found that the evidentiary record of this matter is more consistent with Mathias's assertions in his Florida Action depositions that he treated the 1995 and 1997 options and stock he received as reimbursement for Jacobs's debt under the 1992 Option Agreement. Acceptance of these interests constituted a substituted performance of Jacobs's obligation under the agreement. *See Volk v. Liggett Group Inc.*, No. 96–CV–1921, 1997 WL 107458, at *4–5 (S.D.N.Y. March 11, 1997); 1 *Farnsworth on Contracts* § 4.24, at 521; *Restatement (Second) of Contracts* §§ 279, 280 (1979). Mathias is entitled to the ben-

efit of only one full performance and one satisfaction of a contractual debt; he cannot collect twice to discharge the same obligation, whether payment is made by the promisor himself, by a third person, or by both. *See S & S Textiles Int'l v. Steve Weave, Inc.*, No. 00–CV–8391, 2002 WL 1837999, at *10 (S.D.N.Y. August 12, 2002); *Restatement (Second) of Contracts* § 278.

■ It is true, as Mathias responds, that the doctrine of unjust enrichment does not apply to situations where a written contract between the parties exists governing the particular transaction. *See Lightfoot*, 110 F.3d at 905 (noting that an agreement will not be implied " 'where there is a valid express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought.' " (quoting *Chadirjian*, 506 N.Y.S.2d at 882)); *Indyk*, 694 F.2d at 57; *Clark–Fitzpatrick*, 521 N.Y.S.2d 653, 516 N.E.2d at 193. But, as elaborated by the New York Court of Appeals, this exception pertains to a valid written agreement "the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties . . . ." *Clark–Fitzpatrick*, 521 N.Y.S.2d 653, 516 N.E.2d at 193. The facts at issue in the case at hand do not fit within this formulation. First, while the Option Agreement did exist defining aspects of the transaction in question, the controversy arose because Jacobs disputed the continuing validity of the contract in its entirety, or at least in the form in which Mathias seeks to enforce it. Second, even if that agreement did remain in effect, its scope clearly would not cover the broadened dispute involving the subsequent agreements now before the Court. The Court finds nothing in the contract to support Mathias's bold proposition that he is entitled to accept the benefits of a substituted performance, refuse to discharge the liability and still insist on payment of the original obligation in full.

Mathias also contends that the prerequisites of a claim for unjust enrichment are not satisfied here because any enrichment he may have derived from the 1995 and 1997 Options did not occur at Jacobs's expense, since those securities were issued to him by UWS, not by Jacobs personally. This argument is equally without merit. It misses the point that insofar as Mathias seeks to charge Jacobs personally for performance of a contract obligation that Jacobs, perhaps under a mistaken impression that the Option Agreement was no longer in effect, arranged for UWS to satisfy, Mathias's success in being wrongfully compensated twice for the same debt can only prevail at Jacobs's expense.

The inequity Mathias's theory of the case would engender is palpable. Jacobs testified he would not have conveyed any additional securities to Mathias in 1997 had he not believed that he had no remaining obligation to Mathias under the 1992 agreement. (Tr. at 356; 363–64; 474–75.) Whether Jacobs formed this belief because, as he contends, Mathias repeatedly conceded that the 1992 Option Agreement had been terminated, or based on Mathias's assertions that the 1995 and 1997 rewards he received constituted payments towards Jacobs's 1992 obligation, it is clear that Jacobs changed his position and, to his detriment, advanced Mathias additional securities in reliance on Mathias's representations, direct or implied, that Jacobs's obligation had been terminated or satisfied, in whole or in part.

It is also evident that a sharp factual dispute exists, as well some corresponding evidence on the record, even if conflicting, with respect to two theories: whether Jacobs's 1995 and 1997 payments were made because the parties agreed the 1992 deal

was dead, or because Jacobs was endeavoring to satisfy his still open obligation under that agreement. The trial record, however, is devoid of any trace of evidence whatsoever, other than Mathias's own self-serving and self-discredited testimony, to compel a third proposition, as Mathias propounded at trial: that in numerous transactions consummated between 1995 and 1997, Jacobs repeatedly undertook not only to compensate Mathias prodigally in connection with amorphously defined services and obligations arising from the parties' new relationship, but, separate and unrelated, also to reaffirm his continuing commitment to pay the full amount of the seemingly inextinguishable 1992 liability.

## D. *VALUATION OF THE CREDITS*

■ The Court turns next to a determination of the amounts Jacobs is entitled to deduct from his liability to Mathias on account of the securities Mathias received from Jacobs that the Court has ruled constituted payments towards what remained of Jacobs's contractual obligation. The parties disagree on the proper method for establishing the value of the 1995 and 1997 Options and the URI Stock. Mathias maintains that at the time these benefits were conveyed, he told Jacobs that he needed the funds immediately; that Mathias did not intend to hold the options for

investment purposes and contemplated immediate exercise of the options; and that, consistent with this express intent, Jacobs assisted Mathias with arrangements for a stockbroker to sell the options promptly. On these grounds, Mathias contends that any credit due Jacobs should be determined by the net profits Mathias actually realized at the time he sold his interests: a total of $2,414,421.40 with respect to the 1995 and 1997 Options [10] and $333,330.00 from the URI Stock.[11]

Jacobs, on the other hand, contends that Mathias's choice to sell the options immediately should not affect the true market value of the options and stock Mathias received. To determine the actual fair value of the interests by means of recognized financial markets indicators, Jacobs presented the testimony and report of an expert witness, Ronald Quintero ("Quintero"). Quintero testified that "it would be unequivocally wrong to value the options based on an option holder choosing to undermine value by selling prematurely." (Tr. at 545.) He further indicated that "far and away the principal formula that is used that's reflected both in the accounting literature as the only formula, as well as what is used pervasively by virtually all publicly held companies, and pervasively in option trading" is the Black–Scholes option

---

**10.** Mathias alleged that at the time of his exercise of the 1997 Option he was directed by Jacobs to make a charitable contribution of $200,000 to a designated private organization, thus reducing his actual proceeds by that amount. (Tr. at 77.) Jacobs denied that he issued such an instruction (*Id.* at 357, 483.) The Court concludes that Mathias has not established by a preponderance of admissible and credible evidence that he is entitled to such a credit.

**11.** The actual net proceeds Mathias's wife received from the sale of the first third of the URI Stock was $963,283.00 (Tr. at 80.) In a

seeming reversal of his position as it pertains to the market value of the WMI stock, Mathias argues that any credit relating to his profits from the URI Stock should not be determined by the difference between the purchase price ($3.50) and the actual market price at which the shares were sold. Rather, he holds that because of the restrictions placed on the sale of the stock under the Subscription Agreement, profits should be measured by the initial price at which the URI shares went public ($13.50). (Plaintiff's Post–Trial Memorandum of Law dated September 20, 2002 at 18–19.)

price model.[12] (*Id.* at 531.) By Quintero's computations, employing the Black–Scholes valuation, the actual worth of Mathias's 1995 and 1997 Options at the time they were issued to him was $1,929,412 and $2,376,356 respectively, for a total of $4,305,768. (*Id.* at 539, 544.)

Mathias takes issue with Jacobs's reliance on the Black–Scholes methodology on various grounds. First, he argues that the Black–Scholes formula differs from the Statement of Financial Accounting Standards No. 123 ("FASB 123"), the accounting rule established by the Financial Accounting Standards Board to address corporate reporting in public financial statements of the value of stock options issued to employees. According to Mathias, FASB 123 takes into account additional factors—such as restrictions on transferability, life of the option, value of any services rendered by the option holder—that are not considered by the Black–Scholes model and that could materially affect the value of options. Second, Mathias claims that Quintero in fact did not examine the terms of the UWS stock option plan to identify any conditions for cancellation or forfeiture, or restrictions on transferability or on the exercise of the options that could also determine value.

The Court finds Mathias's arguments unconvincing. Mathias did not engage his own expert to sustain his theory of valuation or to refute Jacobs's. On the other hand, the Court found Quintero's testimony concerning the suitability of the Black–Scholes formula for a valuation of Mathias's options, and the inappropriateness of FASB 123 to a transaction as between individuals such as the one at issue here, sufficiently persuasive. (*Id.* at 602.) Quintero explained the distinction to rest in that FASB 123 is employed primarily for the corporate accounting of stock options whereas Black–Scholes is used as a method to determine how options, whether public or private, are valued. (*Id.* at 602, 633–34.) In any event, Quintero testified that in reaching his opinion he employed certain conservative assumptions which actually produced a lower valuation not materially different from what an application of the FASB 123 formula would have yielded. (*Id.* at 599–600, 634–38.)

Moreover, the testimony of Jacobs and Milne contradicted Mathias's assertions that his options were issued under some understanding that they would be exercised immediately or based on some time contingency other than his own decision to sell. In fact, Mathias did not sell his options immediately. The 1995 Options were approved by the UWS Board on October 11, 1995 and issued to Mathias on December 15, 1995. He sold them between January 30 and February 22, 1996 (*Id.* at 544.) The 1997 Options were granted to Mathias on about March 15, 1997 and he exercised and sold them between April 25 and June 11, 1997. (*Id.*)

The Court thus concludes that the appropriate basis for establishing the fair value of Mathias's 1995 and 1997 Options

12. The model was developed in 1971 by economists Fisher Black and Myron Scholes, for which they were awarded the Nobel Prize in 1997. The essential factors the formula takes into account driving the value of an option to purchase common stock are: (1) the stock price on the date of valuation; (2) the exercise price at which the option holder can purchase the stock; (3) the amount of time over which the option will be valid and outstanding; (4) the volatility of the underlying common stock; and (5) the risk-free rate of interest rates at the time the option is being valued. (Tr. at 530–31.) *See Lucente v. Int'l Bus. Mach. Corp.*, 117 F.Supp.2d 336, 354–55, 360 (S.D.N.Y.2000) ("Modern finance theory accepts several models for determining the net present value of an option grant, Black–Scholes [is one] of them.").

is not their inherent value reflected in the profits Mathias actually realized when he exercised the options but, based on application of the Black–Scholes method of option valuation, the actual market value of the options as of the time they were granted. The Court credits the testimony of Quintero and accepts that, under a proper valuation of the 1995 and 1997 Options, those securities had a real fair value of $1,929,412 and $2,376,356, respectively, at the time they were granted to Mathias.

The Court also concludes that Jacobs is entitled to an offset to account for the value of the URI Stock subscription. In this regard, Mathias has already realized net profits of $963,283.00 through the sale of the first third of the shares that could be sold. The Court notes that Mathias potentially stands to gain additional benefits from sale of the balance of 66,667 URI shares if he prevails in the Florida Action. Moreover, Jacobs has indicated that he would remove impediments to Mathias's sale of these URI shares in the event this Court rules that their value represents credits towards Jacobs's liability. (Defendant Bradley S. Jacobs's Post–Trial Memorandum of Law dated September 20, 2002 at 11.)

### E. THE MARKET VALUE OF WMI STOCK

■ Mathias claims that the proper measure of his contractual right to exercise the 1992 options is the difference between the closing price of WMI shares publicly traded on the NYSE on the exercise date of March 15, 1999, stipulated to be $48.00, and the $3.00 per share option price specified in the 1992 Option Agreement. Mathias thus contends that he is entitled to $7,973,332.30 as consequential damages for the 191,111.09 shares of WMI Jacobs failed to deliver.

Jacobs counters that the trading price is not an appropriate standard in this case because the market value of WMI shares on March 15, 1999 was artificially inflated by a large accounting fraud and other problems at WMI, later revealed, that required a significant downward adjustment to the company's financial statements encompassing the period of March 1999. On this point, Quintero testified that on July 7, 1999, the day following the disclosures, the price of WMI shares fell $20.00, from $53.50 to $33.94, and continued sliding further in reaction to subsequent negative reports, finally ending the year at $17.19 as all the bad news was absorbed and as both the WMI stock prices and trading volume stabilized at a regular level. (Tr. at 552–55.) Adjusting for these circumstances, Quintero considered the true fair market value of WMI stock on March 15, 1999 to be in a range between $15.00 and $20.00. (Id.)

Mathias properly cites the relevant black-letter rule to measure damages in the ordinary situation entailing breach of contract by failure to deliver publicly traded securities subject to an option agreement: the difference between the public market price of the underlying stock on the date of the breach and the option price specified in the agreement. See, e.g., Hermanowski v. Acton Corp., 729 F.2d 921, 922 (2d Cir.1984); Simon v. Electrospace Corp., 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 26 (1971). But Mathias glosses over a critical detail present here that cannot be overlooked as a relevant consideration. As regards UMI, the fair market value of shares traded in March of 1999 did not represent the ordinary case. Quintero testified that the UMI financial statements upon which public investors had relied during the first half of 1999 were materially false. Not long after March 15, 1999, a series of events became public that substantially affected the price

of UMI shares. Insiders sold stock and several WMI board members, the chairman and CEO and the chief financial officer of the company resigned. The company announced that its financial forecasts were inaccurate, that it would take a write-down of $1.763 billion and settle a class action suit for $220 million, with other class litigation to follow. Moreover, analysts downgraded the rating of UMI shares. (Tr. at 552–53.)

It is settled that when the value of securities is artificially inflated by fraud and improprieties or other relevant facts of which the marketplace did not have reasonable knowledge, the public trading price of the shares is not the measure of fair market value. Rather, the market price must be adjusted downward to account for the effects on it demonstrably caused by the irregularities or undisclosed material facts. *See McMahan & Co. v. Wherehouse Entertainment, Inc.,* 65 F.3d 1044, 1048–49 (2d Cir.1995). The terms "price" and value are not necessarily synonymous; under certain circumstances market price may not adequately reflect the true value of a security. *See id.* ("[T]he value of a security may not be equivalent to its market price."); *Beecher v. Able,* 435 F.Supp. 397, 404–405 (S.D.N.Y.1975) ("[R]ealistic value may be something other than market price, where the public is either misinformed or uninformed about important factors relating to the [issuer's] well-being."); *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395, 415–16 (N.D.Ill.1984); *see also In re Board of Water Supply,* 277 N.Y. 452, 14 N.E.2d 789, 791–92 (1938).

Mathias, citing no authority, seeks to limit the application of the exceptional rule to losses sustained by victims of securities fraud who were engaged in direct transactions with the wrongdoers, as opposed to a plaintiff's recoverable damages in a breach of contract claim unconnected with wrongful conduct by third parties that affected the price of the given security. The Court finds no valid basis for this proposition.

The distinction Mathias seeks to draw does not comport with general legal principles governing determination of fair market value. The New York Court of Appeals provides guidance on this point in *In re Board of Water Supply,* 14 N.E.2d at 789. The case involved the proper considerations to be taken into account in the valuation of real property by eminent domain in the context of the unique economic conditions that prevailed during the Great Depression of the 1930's. The Court observed that: "[I]ndications of the elements that may be considered by the authority fixing value, *whether in condemnation or in other cases,* do not abrogate or destroy the general rule that value must be fixed as of the time when the property was converted or taken." *Id.* at 792 (emphasis added). The court then went on to note that the various definitions of the market value of real property applied by courts employ qualifying terms such as "under ordinary conditions" or "under normal circumstances". *Id.* at 791. Speaking in general terms, the court concluded that the "fair market value" of property means "neither panic value, auction value, speculative value, *nor a value fixed by depressed or inflated price,"* and that the true measure resides in an estimate "of what is the fair, economic, just, and equitable value *under normal conditions." Id.* at 792 (emphasis added).

For the purposes of the matter at hand, several essential points emerge from the various courts' elaboration of the definition of fair market value in the foregoing cases: (1) the general concepts and corresponding rules apply equally regardless of the type of property being valued; (2) it does not matter whether the valuation at issue is

performed in connection with private transactions or a public process; (3) the exceptional forces or conditions that may inject an artificial element into the market value of property need not involve wrong-doing by any party involved in the under-lying transaction, or even by third parties; and (4) there is no reference to the "inno-cence" or subjective knowledge concerning the particular special conditions on the part of the party asserting that such cir-cumstances should or should not be weighed in determining the fair market value of a given property. These consider-ations compel the Court's rejection of Mat-hias's theory.

Mathias's argument also lacks sound ba-sis in logic, practical effect or policy impli-cations. If in fact the market price of a security is artificially inflated by reason of the issuer's deception, the true market val-ue of the shares is no less false whether a particular transaction is intended for the benefit of the buyer who purchased direct-ly from the wrongdoer or for another "in-nocent" third party. In either event, the price of the security remains deceptively swelled, and the real issue is whether a party possessing an interest in the proper-ty has a legitimate entitlement to be con-veyed its tainted value.

In the case at hand, had Jacobs pur-chased the UMI shares on March 15, 1999, he, being no less "innocent" of UMI's mar-ket deception than Mathias, would have paid an inflated price, absorbed the impact of the fraud and passed on the benefit of the fraudulent price to Mathias. The es-sence of Mathias's theory is thus that his contract with Jacobs conferred upon him an absolute right to compel delivery of falsely valued property and to claim a windfall engendered and passed on as a premium of fraud or some other extraordi-nary market influence. Under this propo-sition, the plaintiff, by seeking to compel performance of the delivery of securities, could force the defendant to become a victim of securities fraud or unforeseeable conditions. This possibility could occur under circumstances that could encourage abuse and inequity, especially where, as here, the property at issue involved op-tions stock. An option holder possesses the right to control the timing of its exer-cise. If that person has knowledge that the market price of the stock is artificially inflated by wrongdoing at a particular point, he could seek to exercise the option then in order to reap the benefit of the fraud increment reflected in the trading price, and pass the burden of loss to the other unsuspecting party. But even if the promisor is aware that the stock price has been falsely boosted by fraud or extraordi-nary conditions not of his making, he would nonetheless have no recourse but to be compelled, to his detriment, to purchase and deliver the inflated shares.

Moreover, Mathias's argument ignores that the distinction he advances may also work in reverse under given circum-stances, yielding boomerang results no less inequitable and perverse. Fraudulent market manipulation could just as well ar-tificially depress as inflate the price of stock. The party contractually entitled to the delivery of shares at a particular price and at a time when the market price may be deflated by fraud could be held to that lower price, enabling the promisor, even one aware of the exceptional conditions, to claim the benefit of the bargain, thereby compelling the contract claimant to bear the risk of loss as the ultimate victim of the fraud.

In either event, Mathias's posi-tion would permit one or the other party to take advantage of an extraordinary condi-tion beyond his control entailing risks or benefits that neither could have contem-plated, negotiated for or protected against

at the time the parties' bargain was struck. This circumstance brings into play a related general principle also applicable to the proper calculation of contract damages: the rule of foreseeability. A party to a contract is generally expected to anticipate and assume those risks that are reasonably foreseeable at the time the agreement is reached. Consequently, in the event of failure to perform, the promisor is not liable for any loss that, as of the date of the contract, he objectively had no reason to foresee as the probable consequence of nonperformance. *See Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544–45, 23 S.Ct. 754, 47 L.Ed. 1171 (1903); *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir.2000); *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176, 178–79 (1989); *Ashland Mgt. Inc. v. Janien*, 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1010 (1993); *see also Czarnikow–Rionda Co. v. Fed. Sugar Ref. Co.*, 255 N.Y. 33, 173 N.E. 913, 916 (1930); *Chapman v. Fargo*, 223 N.Y. 32, 119 N.E. 76, 78 (1918); *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854); 11 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 1356, at 289–91 (3rd ed.1968); *Restatement (Second) of Contracts* § 351(1) (1981). As articulated by the New York Court of Appeals, recovery for breach of contract is restricted

> to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed. The evident purpose of this well-accepted principle of contract law is to limit the liability for unassumed risks of one entering into a contract and, thus, diminish the risk of business enterprise.

*Kenford,* 540 N.Y.S.2d 1, 537 N.E.2d at 180 (citations omitted).

■ In applying this principle, New York Court of Appeals guidance further bids a common sense inquiry as to what the parties would have concluded had they considered the subject. *Id.; see also Globe Ref.,* 190 U.S. at 543, 23 S.Ct. 754 ("[t]he common rules have been worked out by common sense, which has established what the parties probably would have said if they had spoken about the matter.") To this end

> [i]n determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what 'liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made'.

*Kenford,* 540 N.Y.S.2d 1, 537 N.E.2d at 179 (quoting *Globe Ref.,* 190 U.S. at 544, 23 S.Ct. 754); *see also Restatement (Second) of Contracts* § 351(1) (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.")

■ From these rules, two corollaries follow, both applicable to the matter now before this Court. First is that "[t]here is no requirement of foreseeability with respect to the injured party." *Restatement (Second) of Contracts* § 351 cmt a. And second, insofar as the injured party seeks to burden the promisor with liability purportedly arising from special circumstances beyond those associated directly with the course of ordinary events and the parties' dealings, the claimant must show that such exceptional conditions and attendant risk of unique damages were communicated to the obligor or were reasonably within the contemplation of the parties at the time of contracting as

the probable outcome of a breach. *See Kenford,* 540 N.Y.S.2d 1, 537 N.E.2d at 178, *Chapman,* 119 N.E. at 78.

Application of these rules to the case at hand counsels rejection of Mathias's theory on two separate grounds. First, at the time the parties entered into the Option Agreement in 1992, Jacobs granted Mathias a five-year option in shares of a business Jacobs effectively owned and controlled. The transaction occurred prior to and in anticipation of UWS's public offering. Viewed objectively, Jacobs could not reasonably have contemplated then that years later the company would be sold to a third party which, by means of fraudulent practices, would drive the price of shares in the successor entity to significantly higher artificial levels, and that Jacobs would then be liable to Mathias for the option exercise value of the new company's shares at the falsely inflated market price. Common sense dictates that, had he known that the market consequence of such a wrongful exceptional event would have been charged to him, it is unlikely that Jacobs would have entered into the contract. *See Schonfeld,* 218 F.3d at 172; *Kenford,* 540 N.Y.S.2d 1, 537 N.E.2d at 179.

Under the foreseeability principles articulated above, the converse prospect could also arise. Fraudulent market manipulation could depress the price of stock as well. It is unlikely that Mathias would have accepted the agreement had he been aware that he would be compelled to assume the risk of exercising his options in the context of a fraud on the market that, whether or not known to Jacobs, would artificially lower the stock price of UWS, or a successor company, at which he would have to exercise his options.

Second, the rule of consequential liability Mathias invokes pertains to damages actually sustained, in other words, losses truly incurred or profits actually foregone by a claimant from a missed opportunity by reason of a promisor's failure to deliver the contract shares upon an exercise of the options subject to the parties' agreement. In essence, what Mathias asserts here as his theory of contractual "loss" or "damages" is an entitlement to the amount by which the price of WMI shares on the option date exceeded their true fair market value by reason of fraud. At bottom, this claim is tantamount to a right to collect the fruits of a third person's fraud, and thus for the plaintiff to profit from another's wrongdoing. Mathias can not establish that such a right exists, that he actually suffered these "losses", that he was deprived of a contract benefit to which he had a reasonable expectation by being denied the value of market deception, or that Mathias's entitlement to a bounty from fraud could have been reasonably within the contemplation of the parties. Accordingly, the Court concludes that Mathias is not entitled to claim damages based on the market price of UMI shares on March 15, 1999.

Mathias takes issue with Quintero's expert qualifications and with the rigor of his analysis and methodology, as well as with certain assumptions embodied in Quintero's opinion ascribing a fair market value of WMI stock ranging from $15 to $20 on March 15, 1999. Mathias, however, did not call an expert of his own to refute Quintero or to propound Mathias's own analysis supporting his conclusion that market price should be the proper indicator of WMI stock value for the purposes of this case. The Court has considered Mathias's objections and finds no merit in them.

It is undisputed that beginning on July 7, 1999, the price of WMI fell precipitously following immediately the disclosure of accounting irregularities that required a

downward adjustment in WMI's financial statements extending to March 1999. (Tr. 547–56.) Plunging $20 on the day after the initial public disclosure, the price of the stock continued to decline as additional unfavorable news surfaced, settling at a range of between $15 and $20 during the balance of the year. The Court finds Quintero's analysis persuasive, and his ascribed value of $17.19 to the UMI shares as of March 15, 1999 to be reasonable. Nothing in the record, or in Mathias's purported refutation, suggests that Quintero's figure is unreasonable or that a more appropriate market value exists for UMI shares on the relevant date. On this basis, the Court concludes that a fair market value of Mathias's 191,111.09 UMI shares on March 15, 1999 was $3,285,198. Accordingly, deducting the option exercise price of $1,200,000, and assuming no other adjustments or credits applied, leaves $2,085,198, plus interest, as the amount of any cognizable damages Mathias may recover on account of Jacobs's breach of the Option Agreement.

## F. VALUE OF THE NON–CONTACT CLAUSE

Having ruled that the non-contact provision of the parties' agreements was unreasonably broad and thus unenforceable, the Court invited the parties to propose apportionment of the value of the consideration Mathias received from the Option Agreement to identify what part of their bargain may have been reasonably attributable to the non-contact promise that Jacobs claims Mathias breached. The Court considered such an allocation warranted to prevent unjust enrichment and other inequities. *See Indyk,* 694 F.2d at 57–58; *Restatement (Second) of Contracts* § 183 cmt. b, at 28 ("Fairness requires that a party, having received only a fraction of the performance that he expected under an agreement, not be asked to pay an identical fraction of the price that he originally promised on the expectation of full performance, unless it appears that the performance that he actually received is worth to him roughly the same fraction of what full performance would have been worth to him."). If in fact, as Jacobs contends, the non-contact promise went to the heart of the exchange for which the parties bargained and Jacobs paid considerable sums for it, absent some adjustment the invalidation of the provision would leave Jacobs out of pocket for monies paid on account of consideration that legally could not be performed. On the other hand, full performance on Jacobs's part would leave Mathias having received substantial compensation for a promise he had no binding obligation to carry out.

On this point, Mathias chose not to present any direct evidence, other than his own testimony, to establish his version of the dispute that gave rise to the Option Agreement, the various promises the parties exchanged in that connection and any corresponding apportionment of relative value of the total consideration. Instead, Mathias, relying on the parol evidence rule and the severability clause contained in the United Waste Agreement, sought to exclude the evidence Jacobs proffered in this regard. The Court overruled Mathias's objections and allowed Jacobs's presentation with respect to the value of the non-contact provision in relation to the balance of the promises and consideration the parties exchanged.

As a point of departure in its consideration of this issue, the Court notes three relevant observations. First, the Court having ruled and given the parties notice that the apportionment issue was one of the three questions of fact for which the trial was scheduled, Mathias had the burden of proof to establish the

portion of damages he alleged was represented by the full amount of the options, and to refute Jacobs's claim for an apportionment and offset to reduce Mathias's asserted losses. In this regard, insofar as the Court, in assessing the credibility of the witnesses and ascribing weight to the respective testimony, credits Jacobs's presentation and substantially discounts Mathias's account, the evidence remains essentially unrebutted to establish persuasively that the non-contact provision was a dominant consideration underlying the Option Agreement.

■ Second, in arguing that any apportionment reducing his claimed damages is precluded in this case, Mathias points out that the United Waste Agreement, which sets forth the entire text of the non-contact clause, contains a standard severability clause providing that if any portion of the contract is held void, illegal or unenforceable, the other valid provisions remain in full force and effect. (Pl.'s Ex. 2, United Waste Agreement ¶ 10(c).) Jacobs counters that this provision is not contained in the Option Agreement, and that it would be improper for the Court to import into the Option Agreement a provision it does not contain and thus impose an additional term. The Court agrees. *See Salvano v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173, 623 N.Y.S.2d 790, 647 N.E.2d 1298, 1302 (1995).

The United Waste Agreement sets forth the non-contact clause along with other provisions dealing with confidentiality of certain UWS business secrets and restrictions on competition. The Option Agreement recites the settlement of the parties' dispute regarding Mathias's claim to UWS stock and makes reference to the Mathias's obligations under the United Waste

Agreement, including, by way of illustration, termination of the Option Agreement in the event Mathias violated his non-contact promises. The two agreements, which were simultaneously executed, are clearly interrelated. The Option Agreement itself, however, does not contain the United Waste Agreement's severability clause. It therefore would not be warranted to conclude that the invalidation of the non-contact promise as it pertains to the Option Agreement would leave the portion of the enforceable agreement standing integrated as a whole and thus unapportionable. Moreover, the severability provision addresses only the continuing validity of the remaining promises of the agreement. Nothing in its terms divests the voided clause of any intrinsic value it may have in the parties' arrangement of benefits and obligations that would preclude recognition of its relative worth and permit a resultant adjustment of the consideration attributable to the severed term.

■ The Court finds no merit in Mathias's argument that no apportionment of the Option Agreement consideration is appropriate because the non-contact clause appears only in the United Waste Agreement and not in the Option Agreement. In fact, the Option Agreement contains specific reference to the United Waste Agreement's non-contact provision, illustrating its operation through a specific example of contacts by Mathias that would automatically result in the forfeiture of his 1992 option rights. The plain language of paragraphs 2(a) and 2(b) explicitly mentions Mathias's commitments under the United Waste Agreement and unequivocally incorporates them as obligations that also flow in favor of Jacobs under the Option Agreement.[13] That the particular

---

**13.** The full text of these sub-paragraphs states:

(a) Concurrently herewith, [Mathias] has entered into an agreement with the Compa-

mention of the non-contact provision is expressed by way of illustration, does not detract from the unambiguous incorporation of that promise into the Option Agreement, nor does it diminish the manifest prominence of the commitment.

At the same time, however, the Court is not persuaded by Jacobs's argument that the non-contact reference in the Option Agreement constitutes a stand-alone promise that possesses predominant or sole significance as the consideration for the Option Agreement, independent of any weight ascribed to the other provisions of the two agreements. First, in Paragraph 2(a), the Option Agreement clearly references and implicitly adopts all of Mathias's obligations under the entire United Waste Agreement, not solely the non-contact promise. It expresses in broad terms Mathias's obligation to preserve the confidentiality of certain information and "to refrain from certain action considered harmful to the Company." (Option Agreement ¶ 2(a).)

In paragraph 2(b), Mathias then agrees "in favor of [Jacobs]" that the option rights the agreement grants him are automatically rescinded "should he violate *any provision* of the [United Waste Agreement]." (*Id.* ¶ 2(b) (emphasis added).) This condition, as far as it goes, appears to put on par the various promises to which Mathias committed in the United Waste Agreement.

The specific mention of the non-contact clause in paragraph 2(c) does not by itself elevate its purpose and importance to a free-standing promise because, by its own terms, the provision is cited "[b]y way of illustration." (*Id.* ¶ 2(c).) Moreover, the full non-contact clause as articulated in the United Waste Agreement is much broader in scope and more restricted in duration. It applies to a virtually unlimited array of persons or entities that then or previously had or were prospects for any business relationships with UWS. (United Waste Agreement ¶ 5(b).)

By contrast, the Option Agreement's illustration in paragraph 2(c) specifically mentions prohibited contact only by telephone or letter to "any officer" of UWS, excepting Jacobs, or family member of any officer, including Jacobs's (Option Agreement ¶ 2(c).) In addition, while the non-contact restrictions contained in the United Waste Agreement remain in force for a term of two years, there is no comparable limitation on the duration of the Option Agreement's non-contact language.

Under Jacobs's argument, were the Option Agreement's non-contact clause to possess life of its own unrelated to the frame of reference elaborated in the United Waste Agreement, Mathias's prohibited contact with a UWS board member presumably would violate the Option Agreement but a contact with UWS's bankers or customers would not. Similarly, any proscribed contact occurring one year after United Waste Agreement's prohibition expired would not violate that agreement but would be forever impermissible under the Option Agreement.

▇▇▇ Though the Court thus cannot adopt Jacobs's theory ascribing separate

---

ny (the "Non–Compete Agreement") whereunder, among other things, [Mathias] agrees to preserve the confidentiality of certain information, and to refrain from certain action considered harmful to the Company.
(b) Without limiting any other remedy to which the Company is entitled under the

Non–Compete Agreement, [Mathias] agrees in favor of [Jacobs] that the Option is hereby automatically and unconditionally rescinded and terminated should he violate any provision of the Non–Compete Agreement.
(Option Agreement ¶¶ 2(a), 2(b).)

standing and allocating value to the non-contact promise as the exclusive consideration for Jacobs's granting the 1992 options to Mathias, the Court is nonetheless persuaded that the provision, however and wherever expressed, constituted a dominant part of the parties' agreement.

Neither agreement assigns any particular portion of the value exchanged to any particular provision. Under these circumstances, the Court may apportion the consideration paid in accordance with allocations to be implied by law from the trial evidence adduced reasonably supporting a division of the consideration as between the enforceable and non-enforceable portions of the agreement. *See Portfolio v. Rubin,* 233 N.Y. 439, 135 N.E. 843, 845 (1922); *Ming v. Corbin,* 142 N.Y. 334, 37 N.E. 105, 107 (1894); *Spaulding v. Benenati,* 86 A.D.2d 707, 446 N.Y.S.2d 543, 544 (3d Dep't 1982), *rev'd on other grounds,* 57 N.Y.2d 418, 456 N.Y.S.2d 733, 442 N.E.2d 1244 (1982); *see also Restatement (Second) of Contracts,* §§ 183, 184.

In this connection, the Court credits and assigns significant weight to Jacobs's testimony, as corroborated by Milne and Oscar Folger, the attorney who represented Jacobs in the negotiations of the 1992 agreements, establishing that the non-contact promise went to essence of what Jacobs bargained for in granting Mathias the option to buy 400,000 shares of UWS "in exchange to get out of my life."[14] (Tr. at 343–44; *see also id.* at 277–79; 509–512.)

The task of apportioning the consideration is rendered difficult by the absence in both agreements of any particular allocation of the consideration bargained for to any particular provision of the contracts. In assessing the relative value of the promises expressed in the Option Agreement, the Court notes that the United Waste Agreement contained additional consideration flowing from UWS directly to Mathias presumably linked to Mathias's promise not to compete with UWS and to maintain the confidentiality of UWS trade secrets. For these commitments, UWS agreed to continue Mathias's compensation for two years at the rate of $8000 per month and to provide him health insurance coverage and other benefits. (United Waste Agreement ¶ 2.)

Jacobs argues that Mathias's claim to UWI stock had little value because Mathias had no written record of it, rendering his claim unenforceable under the Statute of Frauds. However, the trial record contains substantial testimony from Jacobs and Milne indicating that Jacobs considered Mathias's claim a serious matter, even if unmeritorious. The timing and vital importance of UWS's impending IPO, Mathias's alleged threats to derail the transaction, and his associations with individuals that Jacobs did not want seen or perceived to be connected in any way with UWS and that could jeopardize the IPO or otherwise harm the company, all provided incentive for Jacobs to resolve the dispute. Jacobs feared what Mathias might do, and considered making peace with Mathias

14. Summarizing the significance to him of the non-contact promise, Jacobs testified that:

I gave him an option to buy, subject to conditions, to buy 400,000 shares and I think it was $3 a share in the end, in exchange to get out of my life, to stop taking to my people, the people who I am making a livelihood on, don't talk to my IPO people, don't talk to my board of directors, not to my employees. Do not talk to their families, don't go off on your wild streak with any of any people, don't be telling any of my people any of your wild stories, don't be telling people you own part of this company, don't bring your strange boxer friend and other strange people around to my people. I don't want that image. I don't want that contact. I don't want that threat in my life.
(Tr. at 343.)

worth a substantial payment for disposing of the considerable nuisance value of Mathias's claim. (Tr. at 335.) In fact, in this respect the non-contact clause was integrally connected with the settlement of the stock claim dispute, constituting the means by which Jacobs could assure that Mathias would not communicate his claimed ownership of an interest in UWS stock, whether real or bogus, to anyone who, on the basis of such contact, might have acted during that critical time in a manner adverse to UWS's interests.

Significantly, the non-contact clause also contained benefits that appear unrelated directly to the UWS's or Jacobs's business interests, but run in favor of and offer personal protection to any UWS officer except Jacobs, and "any family member of any officer including [Jacobs's]," against the kind of intimidation and harassment Jacobs's alleged Mathias had already committed, prompting the non-contact provision. (Option Agreement ¶ 2(c).) To the extent this provision extends its reach to eligible individuals in their personal capacities, unconnected with any direct business tie to UWS or Jacobs, the clause had significant personal value not encompassed by any other benefit that ran to Jacobs from the United Waste Agreement.

Weighing these considerations in the light of all the evidence on the record, the Court concludes that in apportioning a proportionate share of the consideration Jacobs paid for the Option Agreement, the value of the non-contact clause should be worth at least one-third of the consider-ation. Accordingly, any damages to which Mathias may be entitled by Jacobs's non-performance would be decreased proportionately.

### G. *THE KOSOVO LOAN*

Jacobs filed a counterclaim against Mathias to recover a debt of $50,000 arising from a loan to Mathias, in September of 1998, that Mathias claimed he needed to pay captors who allegedly had held him for ransom in Kosovo at that time. At trial, Mathias stipulated to liability for the loan and to granting Jacobs a credit in this amount against any recovery awarded to Mathias.[15] (Tr. at 685–86.) Thus, Jacobs is entitled to payment of $50,000 plus interest running from the date of the loan.

## V. *CONCLUSION*

Mathias sought to exercise his right under the Option Agreement to delivery on March 15, 1999 of 191,111.09 shares of UWI at their market price of $48.00 for his payment of $1,200,000, representing the agreed option price of $3.00 per share. On these facts, Mathias asserts a claim of damages totaling $7,973,332.30, plus interest. The Court concludes, however, that Mathias is not entitled to receive the UMI shares at the market price of $48.00 on March 15, 1999 but at their true market value of $17.19 to account for UMI's financial fraud that had operated as of that date to artificially inflate the market price of the stock. This adjustment would yield $2,085,199.60.[16] However, this raw figure

---

**15.** At trial, Jacobs sought to establish that the circumstances Mathias had described as the reasons for this urgent need of these funds were highly implausible, and that Mathias actually used the proceeds of the loan to pay living expenses. (Tr. at 124–26.) Although otherwise irrelevant in light of Mathias's stipulation to the liability, the evidence on the record bears further on the question of Mathi-as's credibility. On this point, Mathias's account of the circumstances surrounding his need for the loan and the actual application of the proceeds raised sufficient doubt to cast additional clouds over the reliability and credibility of Mathias's testimony overall.

**16.** Assuming payment of interest on this amount at the statutory rate from March 15,

may be further adjusted to reflect the Court's determination that the consideration the parties exchanged in the Option Agreement must be apportioned between the enforceable and unenforceable promises and that the provision the Court invalidated represented at minimum one-third of the benefits for which Jacobs agreed to pay the 1992 options. However, the Court need not fix a more precise allocation of value to the unenforceable provision. Therefore, it is clear that under any of several assumptions, even without any additional modifications, the actual value of the options and securities Mathias has already received, and that Jacobs caused to be paid on account of the 1992 Option Agreement, exceeds the fair market value of any interest Mathias may still hold in the value of the 1992 options as computed above.

First, the Court concludes that Mathias has acknowledged having realized net proceeds of $2,414,421.40 from his sale of the 1995 and 1997 Options and $963,283.00 from the URI Stock, for a total of $3,377,704.40. The actual market value of the 1995 and 1997 options, applying the Black–Scholes model, was $4,305,768. Therefore, the combined real value Mathias has obtained so far from these securities amounts to $5,269,051, prior to any adjustments for interest attributable to the earning potential of the profits actually realized.[17] The Court has ruled that at the time Mathias obtained these interests, they constituted partial payments or credits against Jacobs's liability under the 1992 Option Agreement. In addition, Mathias still holds the remaining 66,667 shares of URI, which represent further potential value Mathias could realize towards satisfaction of any remaining damages due him under the 1992 Option Agreement.[18]

Second, even without any adjustment to account for the actual market value of the 1995 and 1997 Options produced by the Black–Scholes formula, the value Mathias has received from Jacobs as compensation and offsets on account of Jacobs's liability under the 1992 Option Agreement is still greater than the amount of Jacobs's remaining obligation as determined above. The result would be the same were the Court to adjust Jacobs's liability by any amount within the range it has concluded the value the unenforceable non-contact clause represented in relation to the total consideration the parties exchanged in the 1992 Option Agreement. The Court accordingly concludes that Mathias is not entitled to any additional recovery on his claim, and that Jacobs is entitled to judgment in the amount of $50,000.00, plus interest, on his counterclaim.

## VI. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the claim of plaintiff Michael Ned Mathias for damages in this action is DENIED; and it is further

---

1999 to date would produce approximately $494,000.

17. Assuming an interest factor at the statutory rate of nine percent, applied from the date Mathias realized the proceeds of his sale of the 1995 and 1997 Options and the URI Stock, would produce an amount in excess of $1,600,000. The Court need not decide whether the statutory rate would represent the appropriate index for this purpose. Even at a rate significantly lower, the total value Mathias has received still exceeds the highest amount of damages to which Mathias would be entitled under the Court's determination above.

18. Jacobs points out that the opening price of URI shares on September 20, 2002 was $12.40, thus yielding a remaining value to Mathias, assuming he ultimately were able to sell the stock at approximately that price, of $593,336.30. (Def.'s Memo, Ex. 1.)

ORDERED that defendant Bradley S. Jacobs is entitled to recover from Mathias on Jacobs's counterclaim herein a sum of Fifty Thousand Dollars ($50,000.00), plus interest at the New York statutory rate running from September 28, 1998; and it is further hereby

ORDERED the Clerk of Court is directed to enter judgment as set forth above and to close this case.

SO ORDERED.